UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**RUSSELL FISHER**,                           Case No. 4:11 CV 1387

        Plaintiff,                           Judge John R. Adams

     v.                                      REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                         Magistrate Judge James R. Knepp, II

### INTRODUCTION

Plaintiff Russell Fisher appeals the administrative denial of Supplemental Security Income (SSI) under 42 U.S.C. § 1383. The district court has jurisdiction over this case under 42 U.S.C. § 1383(c)(3). This case was referred to the undersigned for the filing of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated July 7, 2011). For the reasons given below, the Court recommends the Commissioner's denial of benefits be affirmed.

### BACKGROUND

Plaintiff filed an application for SSI on August 10, 2005, initially alleging a disability onset date of June 1, 1983. (Tr. 110–110B). By motion of Plaintiff's attorney, the alleged onset date was later modified to August 10, 2005. (Tr. 440). Plaintiff was deemed not disabled initially (Tr. 94, 96) and on reconsideration (Tr. 95, 100). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ). (Tr. 103).

Vocational History

Born in 1983, Plaintiff was 22 years old at the time of his application. (Tr. 110). Records in the transcript show he earned failing grades for almost all classes in eighth grade. (Tr. 150). He then

dropped out of school during the ninth grade. (Tr. 116, 167, 171, 266). Since that time, Plaintiff has worked as a cook, dishwasher, laborer, and telemarketer. (Tr. 113, 130).

<u>Medical History</u>

At the outset, the Court notes that a few medical records in the transcript appear to be those of Plaintiff's father with the same name, given that they report the patient being in his late 30's, having a 20 year history of alcohol abuse, and other facts clearly erroneous for an individual in his early twenties. (Tr. 74–92). The Court will disregard these records.

Plaintiff originally alleged disability because of problems with his legs. (Tr. 105, 112). However, because only Plaintiff's mental impairments are at issue in this appeal, the Court will not include in this summary of Plaintiff's medical history evidence of Plaintiff's physical impairments or limitations.[1] Also, the Court takes notice of, but will not recite in detail, certain relevant facts discussed in the record that may have contributed to Plaintiff's mental impairments. (Tr. 177, 248, 260, 266, 339, 344, 346, 438). Plaintiff's medical history relevant to this appeal is replete with hospitalizations, records of substance abuse, and reports of severe mental distress.

In March 2003, Plaintiff was in a car accident which resulted in a trip to the emergency room. (Tr. 207). Plaintiff sustained injuries to his head, neck, arm, and leg, but ER records show he left the hospital against medical advice after wanting pain medication. (Tr. 208–210, 216). Nursing notes from Plaintiff's brief stay at the hospital report peculiar behavior: "holding breath on purpose then will open eyes quickly to elicit [n]urse response then laugh". (Tr. 214).

---

1. Plaintiff has effectively waived challenges to the ALJ's determination about his physical impairments by not arguing them in his briefs. *See Stiltner v. Comm'r of Soc. Sec.*, 244 F. App'x 685, 686 (6th Cir. 2007).

In April 2006, Plaintiff was taken by ambulance to the ER for a drug overdose and possible seizure after being found unresponsive. (Tr. 225, 228, 230). A year later, Plaintiff was hospitalized for six days because of suicidal and homicidal ideation after increased personal stress and marital difficulties. (Tr. 242, 244–246, 252, 259). This was his first psychiatric hospitalization. Plaintiff's friend took him to the ER after he "couldn't handle life anymore" and "felt like choking the life out of someone else" or himself. (Tr. 261). Plaintiff also exhibited auditory hallucinations and paranoid ideation. (Tr. 247). The attending physician, Jose L. Alappatt, M.D., noted Plaintiff's irritability, anger, and mood swings, and diagnosed Plaintiff as bipolar with depression and suicidal thoughts. (Tr. 242). Plaintiff denied drug use, and Dr. Alappatt reported a drug screen negative for street drugs. (Tr. 242). That said, alcohol and vicodin abuse was reported. (Tr. 247, 252). Dr. Alappatt assigned a GAF of 30 on admission and 60 at the time of discharge. (Tr. 242). He initially remarked Plaintiff "might have functioned at about 70 or so when he was in remission." (Tr. 245).

While hospitalized, psychiatry reports indicate Plaintiff admitted to very disturbing behavior. Not only did Plaintiff admit to attempting suicide before (Tr. 246), but he also said he had "cracked dogs [with] baseball bats and drowned cats that looked [at him] funny" (261). Dr. Alappatt noticed Plaintiff had "some kind of infatuation with death and dying." (Tr. 242).

After leaving the hospital on antidepressants and Seroquel for bipolar disorder, Plaintiff apparently "ran out of [his medication], became agitated, depressed[,] and came back again" to the hospital less than a month later. (Tr. 274). In fact, it turned out Plaintiff "[d]id not get his medication filled because he lost his job and was more angry, depressed, suicidal, and homicidal". (Tr. 276). This time, however, Plaintiff denied suicidal or homicidal ideation. (Tr. 274). He also denied drug or alcohol use. (Tr. 276).

3

Plaintiff stayed in the hospital for four days. (Tr. 274). Dr. Alappatt changed his medications slightly; he "reached maximum inpatient benefit" and was discharged not suicidal or psychotic. (Tr. 274–275). Plaintiff's GAF was 20–25 on admission, and about 60 upon discharge. (Tr. 274). Dr. Alappatt noted "[h]e may have functioned about 60 or 70 when he was in remission." (Tr. 277).

Plaintiff was hospitalized again for seven days in June 2007. (Tr. 266). The attending physician, James Psarras, M.D., noted Plaintiff complained his medications were no longer effective, and he was abusing alcohol and cocaine. (Tr. 266). During this hospitalization, Plaintiff was treated for withdrawal symptoms and major depression, and attended chemical dependency group sessions. (Tr. 266). Treatment records show he had also been using marijuana and benzodiazepines. (Tr. 271). Plaintiff was discharged once he no longer felt suicidal. (Tr. 266–267). Dr. Psarras assigned a GAF score of 20 on admission and 30 on discharge. (Tr. 267). He also indicated 30 was the highest GAF Plaintiff had in the prior year. (Tr. 269). Dr. Psarras' notes reveal not only that Plaintiff had relapsed from alleged sobriety, but also that he had made another suicide attempt sometime in 2006: "[Plaintiff] did make a suicide attempt one year ago by trying to hang himself and cut his wrist." (Tr. 268). Dr. Psarras noted poor judgment, poor insight, and average intellectual functioning. (Tr. 269).

In October 2007, Plaintiff's mental RFC was assessed by a psychiatrist he had been seeing, William Price, M.D. (Tr. 278–279). Dr. Price deemed Plaintiff unemployable, noting his diagnosis of bipolar disorder and the fact that Plaintiff "is medication-dependent". (Tr. 279). Dr. Price also determined Plaintiff has at least moderate limitations in most aspects of functioning, with some being extremely limited. (Tr. 278).

The record contains dozens of individual and group progress notes from Plaintiff's

4

counseling sessions between April 2006 and September 2008. (Tr. 303–350). Throughout his therapy, counselors consistently documented substance abuse of various kinds and Plaintiff's aggressive thoughts and behaviors toward others, sometimes even indicating Plaintiff had committed violent crimes as a juvenile without being caught. (Tr. 345, 347–348). Specifically, Plaintiff reportedly tried to kill his mother on multiple occasions, including once by setting the house on fire while she was sleeping. (Tr. 340). Counselors even reported Plaintiff verbalized an intent to kill a specific individual at a certain point in the future. (Tr. 344, 346). These records also document Plaintiff's continued abuse of several illicit substances, to wit: Plaintiff reportedly experimented with mushrooms, Valium, and opium in addition to his use of alcohol, cocaine, and marijuana. (Tr. 343).

Plaintiff's counseling records show the interwoven nature of his substance use and mental illness symptoms. In June 2006, counselors reported Plaintiff had relapsed on alcohol and marijuana after being let go from his job. (Tr. 334–335). At this time, he again began reporting aggressive feelings toward people (Tr. 334), after having an intervening period of apparent sobriety and feeling "in control" (Tr. 336–337). Recurrent suicidal ideation was noted. (Tr. 331). In July, Plaintiff reported occasional drinking, having violent dreams, and becoming angry. (Tr. 330). But later that month, he reported an improved mood during a session in which no mention of drugs or alcohol was made. (Tr. 328).

Plaintiff did not attend more counseling until May 2007, after his hospitalization that month for homicidal thoughts. (Tr. 327). In June 2007, after being discharged from the hospital, Plaintiff reported to his counselors no suicidal or homicidal thoughts. (Tr. 325). At that time, no mention of drugs was made in his counseling progress notes. (Tr. 325). Counselors informed Plaintiff he must

5

maintain abstinence from drugs and alcohol in order to meet the requirements of the housing program to which he was applying, and Plaintiff showed willingness to abstain from illicit substances. (Tr. 323, 324). However, reports just a few days later indicate Plaintiff used Xanax (Tr. 322), and at the next counseling session, Plaintiff admitted to again using marijuana (Tr. 321).

In August 2007, counseling records show Plaintiff had not used any drugs or alcohol in "a while". (Tr. 317). At this time, he was reported "to be thinking logically", and he "verbalized good understanding of his choices [and] related conseq[uences]". (Tr. 317). The following month, a similarly positive counseling report was made: "[T]hought process is rational, logical, good judgment as direct result of his compliance w[ith] new meds [and] abstinence of illicit substances. [Plaintiff] identified both short [and] long term goals [d]eveloping a more stable life[.]" (Tr. 316). This continued through October, when counselors reported Plaintiff was still substance free and "[d]oing well" with a stable mood. (Tr. 314–315). However, after October, Plaintiff's counselors were unable to reach him, and deemed him non-compliant, with continuing substance abuse problems. (Tr. 373–374).

When Plaintiff returned to counseling in January 2008, he had been using marijuana and cocaine, and his racing, violent thoughts had returned. (Tr. 313). Plaintiff indicated he used marijuana to help him sleep, and cocaine to increase his energy, because his prescribed medications were ineffective. (Tr. 313). But he reportedly made homicidal threats to others and had an irritable, agitated mood at counseling. (Tr. 313). Three months later, Plaintiff reported being clean and having no aggressive thoughts, symptoms, or dreams, and no desire to harm himself. (Tr. 312). At the end of April, Plaintiff again admitted using cocaine, marijuana, and alcohol, and complained of recent mood swings and interpersonal difficulties with his girlfriend. (Tr. 311). He did, however, verbalize

an intent to be clean from illicit substances. (Tr. 311).

In May 2008, Plaintiff reported being abstinent from all substances, including alcohol. (Tr. 310). He complained of some irritability, but no homicidal or suicidal thoughts were reported. (Tr. 310). Two months later, he reported he was "doing ok," with counselors noting he was "med compliant," and had "no pressing concerns" at that time. (Tr. 309). No mention of drugs or alcohol was made in this progress note. But in June 2008, Plaintiff admitted to using cocaine twice a week, and his progress note reports he was isolating himself in his room and sleeping for twelve to seventeen hours a day. (Tr. 307).

Plaintiff attended a group counseling session in July 2008, and admitted he had used cocaine that morning. (Tr. 306). Group progress notes suggest Plaintiff was "using mental illness as [an] excuse to use" cocaine. (Tr. 306). Plaintiff was "resistant to group feedback" and "unable to see how his use" of cocaine was counterproductive to his counseling goals. (Tr. 306). His individual progress note from that day reports he was agitated and depressed, and had been "snapping" at others. (Tr. 305). When he returned to counseling the following month, he was sent to the ER because he had been trying to strangle himself with rope, and had thoughts of slitting his neck and wrists. (Tr. 304). Plaintiff claimed he had been clean for two to three weeks at this point. (Tr. 304). He also denied substance use the following month. (Tr. 303).

Plaintiff's mental illness symptoms are mainly violent in nature. When Plaintiff was sent to the ER by his counselors in August 2008, he reported a history of having made three previous suicide attempts. (Tr. 358). Other records indicate this number may be as high as five. (Tr. 370). According to an intake assessment, Plaintiff at times hears voices. (Tr. 358, 415). He told the intake staffer interviewing him that one time in 2006, he was out hunting deer and wanted to shoot and kill

a specific person he was hunting with, but was talked out of it. (Tr. 372, 415).

The attending physician in the ER who treated Plaintiff in August 2008, Ehab L. Sargious, M.D., noted his reports of hallucinations and depression, but wrote, "It didn't seem that he [was] hallucinating . . . [t]hought content didn't show any delusions." (Tr. 382–383). Plaintiff's toxicology screen was negative for alcohol and illicit drugs at that time. (Tr. 358, 427). However, intake notes indicate Plaintiff had been abusing one of his prescribed drugs to fall asleep and was otherwise non-compliant with his prescribed course of medication. (Tr. 396). Plaintiff was admitted for safety and stabilization; his GAF upon admission was "around 15–20". (Tr. 383).

The following month, Plaintiff's therapist reported he exhibited homicidal and suicidal ideation, though without intent. (Tr. 369). Plaintiff had been having frequent aggressive thoughts toward a certain individual. (Tr. 369). At that time, no evidence of possible withdrawal symptoms was noted, and Plaintiff reported using drugs just "to tolerate people". (Tr. 365).

Dr. Price, who personally treated Plaintiff beginning in April 2006, filled out a form in October 2008 indicating Plaintiff was not then abusing drugs or alcohol, and would still be significantly mentally ill even without substance abuse. (Tr. 379). He then reaffirmed his mental RFC assessment of a year earlier. (Tr. 379).

Plaintiff has had numerous consultative evaluations since applying for SSI. Plaintiff was evaluated by medical consultant Mary Helene Massullo, D.O., in February 2006. (Tr. 167–172). Dr. Massullo noted Plaintiff was a poor historian, but revealed that Plaintiff began smoking at age nine, and at one point in time was reportedly smoking six packs of cigarettes a day. (Tr. 167, 168). Plaintiff told Dr. Massullo he began drinking alcohol at age seventeen, and began using illicit drugs at the age of nine. (Tr. 168). In particular, Plaintiff told Dr. Massullo he used marijuana, mushrooms,

and acid, but denied ever using intravenous drugs. (Tr. 168). Plaintiff said he had used marijuana two days before the evaluation and usually smokes one joint of marijuana a day. (Tr. 168, 169). Dr. Massullo remarked that Plaintiff's intelligence appeared to be on the lower end of the normal range. (Tr. 169, 171).

Consultant psychologist Donald Degli, M.A., evaluated Plaintiff in March 2006. (Tr. 177–180). He noted Plaintiff "was rather odd in his demeanor, slow, halting in his expression and verbalizations." (Tr. 177). When Degli asked Plaintiff why he was not working, Plaintiff reportedly told him, "I'm trying for SSI." (Tr. 177). Plaintiff also told Degli he stopped using marijuana when he got married in mid-2005. (Tr. 177). Degli noted Plaintiff had rehabilitated himself from an earlier substance abuse problem. (Tr. 178). Degli concluded Plaintiff's memory was good, his concentration and thought were slightly impaired, and his judgment and insight were variable. (Tr. 178). Plaintiff reportedly admitted to him that he cut his wrists "a little bit" when he was eighteen years old, but did not tell anyone. (Tr. 178). Degli noted Plaintiff has never had a driver's license, has no explanation for having never gotten a license, and once spent 90 days in jail after failing to pay fines for a conviction of driving without a license. (Tr. 177–178).

Degli conducted a series of psychological tests on Plaintiff. These tests showed a full scale IQ of 88, a verbal IQ of 91, and a performance IQ of 85, putting Plaintiff in the 21st, 27th, and 16th percentiles, respectively. (Tr. 178). The full scale IQ "is in the upper low average range, a mild deformity at worst", and the other two are "only slightly below average", Degli wrote. (Tr. 179). Other tests showed Plaintiff has a "low average memory", a third grade spelling ability Degli referred to as "impoverished", and a fifth grade reading ability. (Tr. 179, 180). These results, Degli said, "reveal[] a learning disorder." Degli assigned a GAF of 60 and noted that, while Plaintiff was

neither "clearly depressed nor anxious", "his pattern of adult functioning speaks to mixed personality disorder". (Tr. 180). In sum, Degli concluded Plaintiff would have difficulty with novel interaction with the general public, and has mildly impaired abilities to withstand stresses of a competitive workplace and maintain concentration, persistence, or pace. (Tr. 180).

Plaintiff was to be evaluated in October 2005 by psychiatrist Robelyn Marlow, Ph.D. (Tr. 153–166), but did not attend the appointment because he had no source of transportation (Tr. 165). Dr. Marlow therefore reported she had insufficient evidence to establish the presence of a disorder and assess Plaintiff's mental RFC. (Tr. 157, 163–165).

In April 2006, psychological consultant Deryck Richardson, Ph.D., evaluated Plaintiff and assessed his mental RFC. (Tr. 181–198). Dr. Richardson noted Plaintiff has a learning disorder, a personality disorder, and a marijuana abuse disorder. (Tr. 182, 188, 189). In assessing Plaintiff's RFC, Dr. Richardson determined Plaintiff has moderate limitations in maintaining social functioning; understanding, remembering, or carrying out detailed instructions; maintaining concentration; interacting appropriately with the general public; getting along with coworkers or peers without distractions; adhering to basic standards of neatness and cleanliness; and responding appropriately to changes in the work setting. (Tr. 191, 196). He determined Plaintiff has only mild limitations in other areas, with no episodes of decompensation. (Tr. 191). Dr. Richardson concluded Plaintiff would have no difficulty following one- to three-step instructions. (Tr. 197). He said Plaintiff would be able to maintain adequate concentration and pace so long stress and pressure were not elevated by requiring a rapid pace, and would have only "some mild difficulties relating to coworkers". (Tr. 197).

In September 2008, several questionnaires were submitted to SSA on behalf of Plaintiff by

10

third parties. Plaintiff's mother reported he has suicidal thoughts, irrational fears, recurrent severe panic attacks, and extreme limitations in his activities of daily living and ability to maintain social functioning. (Tr. 55–56). Plaintiff's father reported similar symptoms, but less severe limitations. (Tr. 57–58). Plaintiff's friend, who reported seeing him every day and knowing him for about fifteen months at the time, said Plaintiff has recurrent obsessions or compulsions, but no persistent irrational fears or recurrent severe panic attacks. (Tr. 59–60). Plaintiff's friend also agreed with the assessment given by Plaintiff's father, noting Plaintiff has moderate – not extreme – restrictions on activities of daily living and the ability to maintain social functioning. (Tr. 60).

Administrative Hearing

A video hearing was held before the ALJ on September 24, 2008. (Tr. 431). Plaintiff did not appear at the hearing because he could not arrange transportation, though his attorney did appear on his behalf. Also appearing was Gary Young, a vocational expert (VE). (Tr. 432).

Plaintiff did not testify due to his absence. But in documents filled out for SSA, Plaintiff said he does grocery shopping, some cleaning, laundry, and mowing. (Tr. 125). An SSA employee who interviewed Plaintiff face-to-face at the time he filled out his SSI application reported Plaintiff had difficulty understanding, concentrating, and being coherent. (Tr. 119).

The VE classified Plaintiff's prior work as a laborer and kitchen helper as unskilled, and his work as a telemarketer as semiskilled. (Tr. 433). The ALJ then asked the VE to assume a hypothetical individual of Plaintiff's age, education, and work experience, and having the following additional limitations: being able to lift up to 50 pounds occasionally, 25 pounds frequently; being able to stand or walk for two hours during an eight-hour workday and sit for six hours during an eight-hour workday; doing only occasional pushing or pulling of the lower extremity; never having

to balance; doing only simple, repetitive tasks with occasional changes of work setting; and having only occasional interaction with coworkers.[2] (Tr. 433). The VE testified such an individual could not perform Plaintiff's past relevant work. (Tr. 433). However, he said such a person could work as an assembler, packer, or inspector, each of which accounted for hundreds of positions in the local economy and tens of thousands of positions in the national economy. (Tr. 433–434).

On cross-examination, the VE was asked to modify the ALJ's hypothetical by including the following: a marked limitation in the individual's ability to work in coordination or proximity to others without being distracted; a marked limitation in the ability to accept instructions and respond appropriately to criticism from supervisors; a marked limitation in the ability to respond appropriately to changes in the work setting; and an extreme limitation in the ability to travel in unfamiliar places or use public transportation. (Tr. 436). This hypothetical individual, the VE testified, would not be able to perform any of the jobs previously given. (Tr. 436).

The Commissioner's Decision

The ALJ issued an unfavorable decision on November 5, 2008. (Tr. 11–29). The ALJ found Plaintiff to be under a disability, but determined that a substance addiction disorder was a contributing factor material to that finding. (Tr. 18–19). Therefore, the ALJ concluded Plaintiff could not qualify for SSI. (Tr. 15). Not considering Plaintiff's substance abuse, the ALJ determined Plaintiff had a residual functioning capacity (RFC) that allowed him to work as an assembler, a packer, or an inspector, each of which accounted for plenty of jobs in the regional economy. (Tr. 27–28). Thus, the ALJ made a finding of not disabled. (Tr. 29).

Plaintiff appealed this denial to the Appeals Council, which accepted review.

---

2. Several parts of this hypothetical were inaudible to the transcriber of the hearing. This is the Court's reasonable inference from the transcript of what was actually said.

(Tr. 9, 351–354). The Appeals Council then issued an unfavorable decision on May 3, 2011. (Tr. 2–7). The Appeals Council affirmed the ALJ's ultimate conclusion that Plaintiff cannot be found "disabled" under the Social Security Act. (Tr. 6–7).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the Court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 1382(a)(1). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step

13

evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.  Was claimant engaged in a substantial gainful activity?

2.  Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.  Does the severe impairment meet one of the listed impairments?

4.  What is claimant's residual functional capacity and can claimant perform past relevant work?

5.  Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The Court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f), 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff now challenges the Commissioner's decision on two grounds:

I. The Commissioner's decision lacks the support of substantial evidence since the ALJ failed to include all of Fisher's mental limitations in her controlling hypothetical question to the VE and in her RFC.

II. The Commissioner's finding that Fisher's polysubstance addiction was material to a finding of disability is not supported by substantial evidence.

14

(Doc. 15, at 7, 12). These arguments are dealt with in turn.

<u>Plaintiff's Mental Limitations</u>

Plaintiff first argues that, assuming *arguendo* Plaintiff's polysubstance addiction materially contributes to his disability, the ALJ's hypothetical question to the VE and her ultimate RFC finding do not sufficiently account for Plaintiff's mental limitations. Specifically, Plaintiff argues the ALJ's hypothetical was unsupported by substantial evidence in that it omitted a restriction that accounts for Plaintiff's ability to maintain concentration, persistence, and pace.

The ALJ asked the VE the following hypothetical, quoted in full:

> I'd like you to assume an individual of [Plaintiff's] age, education, and work experience. I have the following additional [restrictions:] being able to lift up to 50 pounds occasionally, 25 pounds frequently, stand and walk for two hours, sit for six hours, occasional pushing and pulling of the lower extremity; no balancing or falling; occasional [inaudible] for the others; [limited] to simple, repetitive tasks with occasional changes of work setting and only occasional [interaction] with coworkers.

(Tr. 433). In her decision, the ALJ found Plaintiff to have an RFC that closely mirrored this hypothetical, allowing for "simple, repetitive tasks" and occasional contacts with the public and co-workers. (Tr. 26). The Appeals Council, while focusing on the finding that Plaintiff did not meet a listed impairment without consideration of his substance abuse, made slightly ambiguous remarks about Plaintiff's limitation in concentration, persistence, or pace, without the effects of substance abuse:

> The Appeals Council notes however that *excluding the effects of [Plaintiff]'s substance abuse*, [Plaintiff]'s impairments would impose no more than "mild" limitation in activities of daily living; "moderate" limitation in social functioning, "moderate" limitation in concentration, persistence, or pace; and no extended episodes of decompensation. Accordingly, excluding the effects of polysubstance abuse, [Plaintiff]'s impairments do not meet or equal in severity an impairment in the Listing of Impairments.

(Tr. 6). Thus, it is not entirely clear whether the Appeals Council intended to find Plaintiff's

15

limitation in concentration, persistence, or pace to be moderate or "no more than" moderate.

Plaintiff's argument centers on the restriction to simple, repetitive tasks. Citing *Ealy v. Commissioner*, 594 F.3d 504 (6th Cir. 2010), Plaintiff asserts this restriction is insufficient to accurately convey Plaintiff's established mental impairments. However, Plaintiff's reliance on *Ealy* is mistaken. In *Ealy*, the Sixth Circuit – noting that a VE's answer to a hypothetical question can only serve as substantial evidence when the hypothetical accurately portrays a claimant's impairments – found an ALJ's hypothetical insufficient when it omitted the claimant's pace, speed, and concentration restrictions suggested by a consultant psychologist. *Ealy*, 594 F.3d at 516. The court in *Ealy* cited cases where courts have found restrictions of simple, routine, or repetitive work to be insufficient to accommodate moderate difficulties in maintaining concentration, persistence, or pace. *Id.* at 516–517 (citing *Edwards v. Barnhart*, 383 F. Supp. 2d 920, 930–931 (E.D. Mich. 2005); *Whack v. Astrue*, 2008 WL 509210, at *8 (E.D. Pa. 2008)); *see also Johnson v. Astrue*, 2010 WL 5559542, at *8 (N.D. Ohio 2010).

In other words, if Plaintiff actually has moderate (as opposed to only mild) difficulties in maintaining concentration, persistence, or pace, then his RFC does not allow him to perform any and all simple, routine work. If this is in fact the case, then under *Ealy*, VE testimony in response to a question allowing a hypothetical person to perform simple, repetitive tasks, without further restriction accounting for Plaintiff's concentration, persistence, or pace limitations, could not serve as substantial evidence supporting the Commissioner's decision at Step Five.

Here, in light of the ambiguity, the Court interprets the Appeals Council's decision to have adopted the ALJ's finding of a mild restriction[3] in maintaining concentration, persistence, or pace.

---

3. The ALJ did not explicitly distinguish whether she found this limitation to be mild or moderate. However, in determining Plaintiff's RFC without the effects of substance abuse, the ALJ "relied

This is the most reasonable interpretation of the Appeals Council's decision because a more restrictive interpretation would be contrary to law. That is, the Appeals Council simultaneously adopted the ALJ's RFC finding:

> Therefore, absent substance abuse, [Plaintiff] retains the residual functional capacity to perform a reduced range of medium work activity with postural limitations and is limited to work that is simple and repetitive, occasional contact with the public and co-workers and occasional changes in the work setting (as set forth in the hearing decision at page 13).

(Tr. 6). Adopting this finding while changing the severity level of Plaintiff's limitations in residual abilities would be nonsensical. Moreover, adopting a simple, repetitive tasks limitation is consistent with a mild limitation in concentration, persistence, or pace, but case law makes clear it is insufficient to accommodate a moderate restriction in this area. *See Ealy*, 594 F.3d at 516–517.

The only feasible conclusion to draw is that the Appeals Council adopted the ALJ's RFC findings, which inherently includes findings as to the severity of Plaintiff's underlying functional limitations. The parties do not dispute that the Appeals Council adopted the ALJ's RFC determination. Indeed, if the Appeals Council had overturned the ALJ's RFC finding, it would not have been able to then rely on the VE's testimony to say, as it did, that "there are other jobs existing in significant numbers in the national economy which [Plaintiff] is capable of performing." (Tr. 6). Varying the severity level of Plaintiff's limitation in maintaining concentration, persistence, or pace from what was posed to the VE in a hypothetical question would result in the Commissioner not being able to use the VE's answer as evidence to overcome his burden at Step Five. *See Ealy*, 594 F.3d at 516 (noting that a VE's answer to a hypothetical question can only serve as substantial

---

extensively" on the opinions of two doctors who deemed this limitation to be mild, and did "not give great weight" to the opinion of the doctor who characterized it as moderate. (Tr. 26). Plus, her simple, repetitive tasks restriction implies only a mild limitation.

evidence when the hypothetical accurately portrays a claimant's impairments). Here, the Appeals Council needed to rely on the VE's testimony – offered in response to a hypothetical allowing for only a mild limitation in concentration, persistence, or pace – to make a finding that an adequate number of jobs Plaintiff could still perform exist in the economy. Thus, the final decision of the Commissioner must be that Plaintiff's limitation in his ability to maintain concentration, persistence, or pace, is mild.

There is substantial record evidence supporting a finding that Plaintiff's RFC, when the effects of drug addiction and alcoholism are subtracted, includes only a mild limitation in maintaining concentration, persistence, or pace – making the ALJ's hypothetical sufficient to accommodate for Plaintiff's mental limitations. For instance, consultative psychologist Donald Degli deemed this ability to be only mildly restricted. (Tr. 180). Also, Dr. Richardson's April 2006 RFC assessment agreed that Plaintiff has only mild difficulties in maintaining concentration, persistence, or pace. (Tr. 191). Dr. Richardson concluded Plaintiff would have no difficulty following one- to three-step instructions, wholly consistent with the ALJ's "simple, repetitive tasks" restriction. (Tr. 197). He also said Plaintiff would be able to maintain adequate concentration and pace so long as stress and pressure were not elevated by requiring a rapid pace, and would have only "some mild difficulties relating to coworkers". (Tr. 197). He found Plaintiff's attention span and concentration to be "fair". (Tr. 197). All of this support the ALJ's hypothetical question and ultimate RFC finding.

The only medical opinion in the record contrary to this limitation is that given by one of Plaintiff's treating psychiatrists, Dr. Price. In October 2008, Dr. Price reaffirmed his October 2007 mental RFC assessment of Plaintiff. (Tr. 379). This earlier assessment reported Plaintiff is moderately limited in his ability to maintain attention and concentration for extended periods,

moderately limited in his ability to perform at a consistent pace without an unreasonable number and length of rest periods caused by psychological symptoms, and markedly limited in his ability to work in coordination with, or proximity to, others without being distracted by them. (Tr. 278). Dr. Price tempered these conclusions by also indicating Plaintiff is not significantly limited in his ability to carry out detailed instructions, perform activities within a schedule, and make simple work-related decisions. (Tr. 278).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" – reasons "sufficiently specific to make clear . . . the weight [given] to the treating source's medical opinion and the reasons for that weight" – for discounting a treating physician's opinion. *Id.*; 20 C.F.R. § 404.1527(d)(2). Failure to do so requires remand. *Blakely*, 581 F.3d at 409–410.

Here, the ALJ gave good reasons for discounting Dr. Price's mental RFC assessment. Notably, the check-marked form Dr. Price filled out, with no detailed explanation, seems to conflict with his own progress note from the same day he filled out the RFC assessment. That day, October

19

29, 2007, Dr. Price reported Plaintiff was "doing well" with a "stable" mood and no side effects from medication. (Tr. 315). Indeed, Dr. Price offered no clinical or laboratory findings to support his assessment, other than stating Plaintiff had been diagnosed with bipolar disorder. (Tr. 279). As the ALJ noted, in the October 2008 form, Dr. Price did not reconcile his opinion with the fact Plaintiff was still being treated for ongoing substance abuse. At that time, Dr. Price indicated Plaintiff was not abusing drugs or alcohol (Tr. 379), but his own treatment records show Plaintiff admitted to starting his cocaine habit anew as recently as four months prior (Tr. 307). Also, records from Plaintiff's hospitalization just two months beforehand indicate Plaintiff was abusing one of his prescribed medications. (Tr. 396). Thus, Dr. Price's opinion is somewhat unreliable. Accordingly, the ALJ was entitled to discount the RFC assessment provided by Dr. Price, and rely on the two consultative psychological assessments instead.

In sum, the ALJ's RFC determination, which was ultimately adopted by the Appeals Council, is supported by substantial evidence. The record shows Plaintiff's limitation in the area of maintaining concentration, persistence, or pace, when the effects of his substance abuse are not considered, is only mild, requiring merely a restriction to simple, repetitive tasks. The ALJ was entitled to rely on the VE's answer to her hypothetical question as evidence to meet the Commissioner's burden at Step Five because the hypothetical accurately portrayed Plaintiff's limitation in his ability to maintain concentration, persistence, or pace.

<u>Polysubstance Addiction</u>

Plaintiff next argues the conclusion that his polysubstance addiction materially contributes to his disability is unsupported by substantial evidence. The Court disagrees.

Under the Social Security Act, an individual "shall not be considered to be disabled . . . if

20

alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C). To determine whether a drug addict or alcoholic is disabled under the Act, the Commissioner determines whether the individual would still be disabled if they stopped using drugs or alcohol. 20 C.F.R. § 416.935(b)(1). If such an individual would otherwise be found disabled, the Commissioner examines the physical and mental limitations that would remain if the individual stopped using drugs or alcohol, and then determines whether those remaining limitations would be disabling. 20 C.F.R. § 416.935(b)(2). If they would not be, then the individual's drug addiction or alcoholism is a contributing factor material to the determination of disability. 20 C.F.R. 416.935(b)(2)(i). Plaintiff carries the burden of proving his substance abuse is not a materially contributing factor to his claimed disability. *See Mittlestedt v. Apfel*, 204 F.3d 847, 852 (8th Cir. 2000).

In this case, the ALJ determined Plaintiff would be disabled under Listings 12.04 and 12.09, but came to the conclusion drug addiction and alcoholism play a material role:

> [Plaintiff's] medical records are replete with documentation of emergency/inpatient hospital treatment for symptoms of depression with mood instability, agitation, manic behavior, anger, suicidal and/or homicidal ideation. The pattern of these hospital treatment[s] reflects current or recent drug abuse (cocaine, marijuana, [or] alcohol), low GAF scores on admission (e.g., 20), and prompt substantial improvement with treatment and much higher GAF scores after treatment (e.g., 60).

(Tr. 21). After discussing records from all of Plaintiff's hospital stays, the ALJ summarized various records from counseling and consultative evaluations, wherein Plaintiff admitted to various types of substance use and was still deemed capable of employment by reviewing psychologists. (Tr. 22–23). She also discussed records from Dr. Price, noting (as explained above) that his opinion on Plaintiff's impairments without regard to substance abuse is unreliable because his own records indicate Plaintiff was still being treated for substance abuse at the time. The ALJ summarized her

21

findings from the evidence:

> [Plaintiff's] medical evidence establishes that [Plaintiff's] emotional/functional status has regularly deteriorated at times when he has abused drugs or alcohol, and that his treatment for symptoms of bipolar affective disorder has been consistently associated with his treatment for drug/alcohol abuse and dependence. Accordingly, I find here that [Plaintiff's] mental impairments, with consideration [of] the effects of his polysubstance abuse and dependence disorder, satisfy the severity requirements of Listing sections 12.04B–C with Listing section 12.09, as set forth above. . . . However, [Plaintiff's] mental impairments, without consider[ing] the effects of his polysubstance abuse and dependence disorder, do not satisfy the severity requirements of Listing sections 12.04B–C with Listing section 12.09, as set forth above.

(Tr. 25–26).

The Appeals Council adopted the result reached by the ALJ, but clarified the ALJ's opinion somewhat:

> The Appeals Council notes however that *excluding the effects of [Plaintiff's] substance abuse*, [Plaintiff's] impairments would impose no more than "mild" limitation in activities of daily living; "moderate" limitation in social functioning[;] "moderate" limitation in concentration, persistence, or pace; and no extended episodes of decompensation. Accordingly, excluding the effects of polysubstance abuse, [Plaintiff's] impairments do not meet or equal in severity an impairment in the Listing of Impairments. Therefore, absent substance abuse, [Plaintiff] retains the residual functional capacity to perform a reduced range of medium work activity with postural limitations and is limited to work that is simple and repetitive, occasional contact with the public and co-workers and occasional changes in the work setting (as set forth in the hearing decision at page 13). . . . Since [Plaintiff's] drug and alcohol abuse is found "material" to a finding of disability, pursuant to 20 C.F.R. § 416.935 and P.L. 104-121, Plaintiff cannot be found "disabled" under the Social Security Act[.]

(Tr. 6).

On review, the record reveals somewhat of a predictable pattern, just as the ALJ alluded to

(Tr. 21): Plaintiff becomes mentally stable on the proper combination of prescription medications

and abstinence from drugs and alcohol (Tr. 242–243, 266, 274–275, 309–310, 314–317, 319), then

Plaintiff stops taking his medications as prescribed, starts using some combination of cocaine,

22

alcohol, marijuana, or benzodiazepines (Tr. 306, 307, 311–313, 321–322, 330–331, 334, 338, 343, 365), or misuses his prescribed medications instead (Tr. 342, 396), and then becomes mentally unstable or shows symptoms of mental illness again (Tr. 242–245, 266–269, 276–277, 304–305, 321, 330–331, 334, 337, 338, 350, 367–369, 371–372, 374). This is a fair indication that Plaintiff's polysubstance abuse at least materially contributes to his disability.

Plaintiff argues not all of his hospitalizations were for drug or alcohol use. In particular, Plaintiff points to his April 2007 hospitalization. (Tr. 242–265). Plaintiff was hospitalized then for threatening suicide and homicide. (Tr. 244). During this time, his GAF was assessed to be 30 on admission and 60 on discharge. (Tr. 242). He denied the use of drugs or alcohol, and records indicate his marital problems helped spark this bout of depression. (Tr. 244). But contrary to Plaintiff's argument that substance abuse played no role in this hospitalization, treatment notes from this period do report alcohol and vicodin abuse. (Tr. 247, 248, 252). In fact, Plaintiff reportedly drank an excessive amount of whiskey the night before going to the hospital. (Tr. 248, 327).

Upon Plaintiff's admission to the ER that month, Dr. Alappatt remarked he "might have functioned at about 70 or so when he was in remission." (Tr. 245). But reading this report as a whole, Dr. Alappatt's use of the word "remission" probably refers to his tentative diagnosis of "major depression, recurrent episode" – not substance abuse. While in the hospital, Dr. Alappatt reported a drug screen negative for street drugs. (Tr. 242). But, as mentioned above, the timing of Plaintiff's admitted use of vicodin and whiskey (the night before) tends to show that drug addiction and alcoholism materially contributed to the situation requiring his hospitalization. (Tr. 248, 252). Therefore, substantial evidence does support a finding that Plaintiff's impairments necessitating this hospitalization were materially contributed to by Plaintiff's substance abuse.

23

The summer of 2007 provides perhaps the clearest evidence of the simple pattern to which the ALJ alluded. In May of that year, Plaintiff was discharged from the hospital with new prescriptions and reported no suicidal or homicidal thoughts. (Tr. 325). But in June, Plaintiff relapsed on alcohol, marijuana, cocaine, and benzodiazepines again (Tr. 266, 268, 271), and immediately landed right back in the hospital for seven days with hallucinations, depression, and homicidal and suicidal impulses (Tr. 268). He was treated for withdrawal symptoms and major depression, and was discharged once he no longer felt suicidal. (Tr. 266–267). Thereafter, in August, Plaintiff was reportedly sober and "thinking logically" with "good understanding of his choices [and] related conseq[uences]". (Tr. 317). No significant symptoms were reported. (Tr. 317). This continued on through September, when Plaintiff was still reportedly clean and his counselors said his "thought process is rational, logical" and he had "good judgment as [a] direct result of his compliance [and] abstinence". (Tr. 316). No significant symptoms were reported during these months of sobriety.     Various other records in the transcript show a correlation between symptoms of Plaintiff's mental impairments and his substance abuse. For instance, Plaintiff attended a group counseling session in July 2008, and admitted he had used cocaine that morning. (Tr. 306). His individual progress note from that day reports he was agitated and depressed, and had been "snapping" at others. (Tr. 305).

Even Plaintiff's August 2008 hospitalization follows the pattern. Though Plaintiff had suicidal ideation, his toxicology screen was negative for drugs and alcohol. (Tr. 358). But it appears this hospitalization was also materially caused by substance abuse. That is, intake notes reflect Plaintiff admitted he had been abusing one of his prescribed medications so he could fall asleep. (Tr. 396). So despite the fact his system was negative for alcohol and illicit drugs (Tr. 358), evidence

24

shows drug addiction still materially contributed to this hospitalization.

One possible exception to the pattern is when Plaintiff was hospitalized in May 2007. Dr. Alappatt made a remark similar to what he noted the month before, suggesting Plaintiff may have functioned "about 60 or 70 when he was in remission." (Tr. 277). This time, though, it is not apparent from the records that he was referring to anything other than Plaintiff's substance abuse. Dr. Alappatt noted Plaintiff was sober at the time but had not been taking his medication. (Tr. 276–277). Plaintiff denied using drugs or alcohol and no treatment records from this hospitalization contradict this. (Tr. 276). But this one instance in the record indicating Plaintiff has mental impairments of significant severity notwithstanding his drug addition and alcoholism is not enough for the Court to reverse, especially when treatment notes suggest Plaintiff was still suffering from a continuation of the symptoms he had the month before: "[Plaintiff] is still decompensating. Has not been taking medication". (Tr. 277). As mentioned previously, the record shows the April 2007 hospitalization *was* caused by substance abuse. (Tr. 247, 248, 252, 327). Therefore, even if no new substance abuse caused the May 2007 hospitalization, there is nonetheless substantial evidence supporting the ALJ's conclusion that Plaintiff's impairments are not of disabling severity when his drug addiction and alcoholism are not taken into consideration.

Plaintiff argues the Appeals Council and ALJ took the wrong approach in their analysis, pointing out the Sixth Circuit has approved of an ALJ comparing limitations during periods of sobriety with limitations during periods of substance abuse to determine the materiality of the substance abuse. *See Bartley v. Barnhart*, 117 Fed. App'x 993, 998 (6th Cir. 2004). In *Bartley*, the court was fine with allowing the ALJ to do this, but, notably, the periods of sobriety were plenty long enough – at one point, eight months long – to see a clear distinction between limitations caused

25

by substance abuse and those not. *Id.* Plaintiff asserts that analysis under this approach would necessarily lead to a different result because he arguably still had significant mental impairments during periods of sobriety.

Examining the record in this light is not substantively different from the way the ALJ undertook her analysis, but even looking at it from this angle, the same result is reached. Unlike in *Bartley*, the record in this case indicates periods of true sobriety were few and far between. Plaintiff suggests records from his June 2007 hospitalization show severe mental impairments notwithstanding drug and alcohol use, because he was discharged after a week in the hospital (without drugs or alcohol) with a GAF score suggesting he was still very seriously impaired. Specifically, Dr. Psarras reported a GAF on admission of 20 and a GAF on discharge of 30. (Tr. 267). But, importantly, part of Plaintiff's discharge diagnosis was "[a]lcohol withdrawal". (Tr. 267). One week without drug or alcohol use is not the kind of sobriety period discussed in *Bartley* that an ALJ can use for comparison; as this shows, withdrawal symptoms can last longer than that. In other words, the record supports the conclusion Plaintiff's impairments at the time of his discharge in June 2007 were still materially caused by his alcohol abuse. As such, this cannot be used for comparison to periods of non-sobriety.

Several of the periods of sobriety contained in the record actually contradict Plaintiff's argument. For example, in August and September 2007, Plaintiff reportedly abstained from illicit substances. (Tr. 316–317). Consistent with the ALJ's conclusion, Plaintiff's thought processes during this time were rational and logical, and he reportedly had "good judgment as [a] direct result of his compliance w[ith] new meds [and] abstinence of illicit substances." (Tr. 316). But when Plaintiff returned to counseling in January 2008, he had started using marijuana and cocaine again,

and his racing, violent thoughts had returned. (Tr. 313). In April 2008, Plaintiff reported being clean and having no aggressive thoughts, symptoms, or dreams, and no desire to harm himself. (Tr. 312). But again, later that month, he admitted using cocaine, marijuana, and alcohol, and then complained of having mood swings and interpersonal difficulties with his girlfriend. (Tr. 311).

Similarly, Plaintiff reported being free of all illicit substances in May 2008 (Tr. 310), and for the next month, his counseling progress notes made no reports of disabling symptoms (Tr. 309–310). But, Plaintiff began using cocaine in July and reported irritability and "snapping" at others. (Tr. 305–306 ). Further, Plaintiff started abusing one of his prescribed medications in August, and he wound up in the hospital with depression and suicidal tendencies. (Tr. 304, 396). These instances of sobriety provide substantial support not only for the notion that Plaintiff's impairments during times of sobriety are not of the disabling severity they are during times of substance abuse, but also for the consistent pattern noted by the ALJ.

Ultimately, the Court is convinced from the record that Plaintiff suffers from severe, disabling mental impairments. However, the Social Security Act's drug addiction and alcoholism mandate requires Plaintiff not be found "disabled" under the Act given the contribution substance abuse makes to his condition. The decisions of the ALJ and Appeals Council have the support of substantial evidence in the record.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, the Commissioner's decision denying SSI is supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

s/James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).